Filed 9/5/13  Sundquist v. Bank of America CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| ERIK SUNDQUIST et al., | C070291 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCV0029401) |
| v. | |
| BANK OF AMERICA, N.A., etc., | |
| Defendant and Respondent. | |

In this action, plaintiffs Erik and Renee Sundquist sued Bank of America and various other defendants for the consequences of a home loan they could not afford.  The trial court sustained the demurrer of three defendants without leave to amend.  On appeal, we conclude the court erred in sustaining the demurrer as to some of the causes of action.  Accordingly, we will reverse.

FACTUAL AND PROCEDURAL BACKGROUND

The Sundquists are a married couple.  In July 2008,  they wanted to move to a smaller home, so they contacted defendant Christopher Harris, an employee of defendant Ella Financial, Inc. (Ella), a mortgage loan brokerage firm, to help them obtain a

1

purchase money loan to buy a home on Feliz Way in Lincoln. Harris had previously helped them obtain two refinances and a business loan.

The Sundquists worked with Harris from July through September to obtain the loan. They had several telephone calls with him each week and also faxed and e-mailed documents to him.

When they spoke with Harris in July, the Sundquists told him they could afford a monthly loan payment of $2,500; Harris told them he could obtain a loan with that payment amount. He told them to pay off their Wells Fargo credit card and their Suburban to reduce their debt so they would qualify for the loan.

Between July and September, the terms of the proposed loan, including the interest rate, were constantly changing. The first loan Harris presented to the Sundquists was completely different from the loan they eventually agreed to. The Sundquists found themselves asking, " 'what happened to the loan presented to us last week?' "

The Sundquists were not happy with the loan they eventually agreed to, but Harris told them they should just take the loan and get into the new house, and they could refinance or modify the loan immediately. During the last few weeks leading up to closing, they felt rushed because they were told someone else was going to purchase the house with cash and they would lose it.

As the closing of the loan neared, the Sundquists began communicating directly with defendant Mary Kennaugh, a representative of the lender Harris had secured for them, defendant Mission Hills Mortgage Bankers (Mission Hills). Initially, Kennaugh requested information about the Sundquists from Harris, but because Harris constantly delayed in responding, Kennaugh and the Sundquists decided to communicate directly with each other.

Kennaugh completed the Sundquists' uniform residential loan application for them. Kennaugh overstated their income in the application as being $20,943 per month

2

when she knew it was far less. (Erik, who owned a construction company and a real estate company, made about $12,000 a month and Renee was a stay-at-home mother.)

In the end, the Sundquists borrowed $587,250 from Mission Hills in September 2008 to purchase the home on Feliz Way. They made a down payment of $125,000. The closing of the loan transaction occurred at a title company office. The entire process took about 15 to 20 minutes. No one explained the terms and consequences of the loan to them, and they did not have an opportunity to ask questions. The notary simply told them where they should sign.

The loan was for 30 years at a fixed interest rate of 6 percent and was secured by a deed of trust on the property. The beneficiary of the deed of trust was Mortgage Electronic Registration Systems, Inc. (MERS) acting as nominee for Mission Hills and its successors and assigns. The loan was an FHA loan, which Harris had told them was much easier to modify than a conventional loan.

The monthly payment on the loan was about $4,500 per month, which was more than the payment on their previous home. In January 2009, the Sundquists contacted defendant Bank of America to modify the loan,[1] but the bank stated that it would not consider a loan modification unless the Sundquists were in default. To obtain a loan modification, the Sundquists stopped making their monthly loan payments. In April 2009, the Sundquists hired a company to help them obtain a loan modification. Throughout the summer, the Sundquists believed the company was communicating with Bank of America and had submitted all of their financial information to obtain a

---

[1]     The complaint does not clearly explain how Bank of America became involved in the loan only a few months after Mission Hills made the loan. There is an allegation that Bank of America purchased the loan from Mission Hills, but there is no allegation as to when that occurred. In their reply brief, however, the Sundquists assert that the loan was sold to Countrywide Home Loans Servicing LP "immediately after closing" and that Bank of America later merged with Countrywide.

modification. When Renee called Bank of America, however, the bank said nothing had been done.

In July 2009, a notice of default was recorded against the house by defendant ReconTrust Company acting as agent for MERS as the beneficiary under the deed of trust. The notice stated that the Sundquists were more than $25,000 behind on their loan payments.

In late September or early October 2009, Bank of America sent a letter to the Sundquists informing them that they did not qualify for a loan modification because their income was too high. After reviewing some documents, however, the Sundquists realized the loan modification company had overstated some of their assets, such that the bank was under the misimpression that they were still making payments on their old home, some previously owned business real estate, and an airplane. The old home and the business real estate had both been sold through short sales. The Sundquists worked with Bank of America to clarify their financial status.

In late October 2009, ReconTrust recorded a notice of trustee's sale indicating the house was to be sold at public auction on November 12. That sale apparently did not go forward, however. Meanwhile, the Sundquists remained in contact with Bank of America.

In the spring of 2010, the Sundquists began working with another company to get a loan modification. The Sundquists spoke to Bank of America and provided financial information over the phone. The bank told them, however, that the bank could not move forward with the loan modification because the arrears were too high and they were too far in default.

On June 15, 2010, the Sundquists filed for chapter 13 bankruptcy and began making payments to the bankruptcy trustee for the loan. That same day, ReconTrust executed a trustee's deed upon sale to defendant BAC Home Loans Servicing, LP, formerly known as Countrywide Home Loans Servicing LP (BAC). Also on that day,

4

MERS assigned its interest in the deed of trust and the underlying promissory note to BAC. Both documents were notarized on June 23 and recorded on June 25.

In July 2010, BAC commenced proceedings to evict the Sundquists from the house. The Sundquists contacted Bank of America, and the bank admitted the house was sold in error while the Sundquists were in bankruptcy, but fearing they would be kicked out anyway, the Sundquists moved out of the house and into a rental home in September 2010. After they moved out, the locks were changed and "no trespassing" signs were posted on the windows.

In December 2010, a notice rescinding the trustee's deed upon sale was recorded. The Sundquists did not move back, however, because the locks had been changed and their children were going to new schools.

In June 2011, the Sundquists commenced this action by filing a complaint for damages and equitable and injunctive relief against Mission Hills, Ella, Harris, Kennaugh, ReconTrust, Bank of America, and BAC. As relevant here, the complaint alleged four causes of action against Bank of America as the successor to Mission Hills: deceit, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligence. The complaint also included Bank of America as a defendant in a cause of action for civil conspiracy. A cause of action for promissory estoppel was alleged against BAC, while a cause of action for wrongful foreclosure was alleged against BAC and ReconTrust. Finally, all three of these defendants (Bank of America, BAC, and ReconTrust) were named as defendants in a cause of action for unlawful, unfair and/or fraudulent business practices under Business and Professions Code section 17200 (hereafter, unfair competition).

With respect to Bank of America being the successor to Mission Hills, the complaint alleged that Bank of America "was the purported to subsequent successor and assignor of the Subject Loan are [*sic*] liable for all acts of MISSION HILLS based on successor liability law and particularly because it assumed all liability of the original

5

lender by the terms of which it succeeded to the Subject Loan." The complaint also alleged that Bank of America "is liable for all misconduct as successor in interest to MISSION HILLS. Specifically, [Bank of America] assumed all liabilities on the loan in its purchase of the loan from MISSION HILLS."

The deceit cause of action alleged that Harris had misrepresented to the Sundquists that they "could refinance or modify immediately after obtaining the loan" and that Harris or Kennaugh had misrepresented "that the loan application prepared by Defendant correctly stated the [Sundquists'] income." The civil conspiracy cause of action alleged that the various defendants "conspired and agreed to implement a scheme to defraud and victimize [the Sundquists] through the predatory lending practices and other unlawful conduct alleged herein." The breach of fiduciary duty cause of action was based on the same two misrepresentations as the deceit cause of action, as well as Harris's failure to disclose that Ella and Harris "received a financial benefit from the lender MISSION HILLS for convincing [the Sundquists] to sign the loans with their particular terms." The negligence cause of action was likewise based on the origination of the loan.

The promissory estoppel cause of action alleged that BAC "stated they would not consider a modification until [the Sundquists] defaulted"; the Sundquists relied on that statement by ceasing to make their monthly loan payments; and the Sundquists were injured because they were denied the loan modification, "wasted time repeatedly calling Defendants' agents," and "will lose their home and it will be unlikely that [they] will be able to purchase a new home."

Bank of America, acting for itself and as successor by merger to BAC, and ReconTrust, demurred to the complaint. With respect to the first six causes of action (all but the promissory estoppel and wrongful foreclosure claims), which Bank of America characterized as "relat[ing] entirely to the loan's origination," Bank of America asserted that it could not be held liable for conduct in which it did not take part based on "[a] conclusory allegation that [Bank of America] simply assumed [Mission Hills'] liability

6

when it was assigned the loan." Bank of America also asserted that: (1) the deceit claim failed because the Sundquists did not allege detrimental reliance or damages; (2) the conspiracy claim failed because they did not allege any underlying wrongdoing; (3) the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims failed because the bank did not owe the Sundquists a fiduciary duty; (4) the negligence claim failed because the bank did not owe the Sundquists a legal duty and because it was time-barred; (5) the unfair competition claim failed because they did not allege wrongful conduct and lacked standing; (6) the promissory estoppel claim failed because the Sundquists did not allege promissory estoppel; and (7) the wrongful foreclosure claim failed because they did not allege tender, they did not allege that the bank had notice of the bankruptcy, and the court lacked jurisdiction over that claim.

The trial court sustained the demurrer on all of the grounds asserted by the bank and, finding that the Sundquists had "failed to make a showing that the amendments they suggest would change the legal effect of the pleading," denied them leave to amend. A judgment of dismissal was entered on November 10, 2011. The Sundquists timely appealed.

## DISCUSSION

### I

### *Standard Of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an

7

abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

## II

### *Assumed Liability*

With respect to the first six causes of action (deceit, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, and unfair competition), the trial court found that the Sundquists had "set[] forth no factual or legal authority for the conclusory allegation that Bank of America assumed liability for affirmative causes of action related to the origination of the loan when it became successor and assignor of the subject loan."[2] In effect, the court concluded that whatever tort or statutory liability the original lender, Mission Hills, may have had to the Sundquists with relation to the origination of the loan, the Sundquists had not adequately alleged (or shown that they could adequately allege) a factual basis for concluding that Bank of America assumed or succeeded to that liability.

On appeal, the Sundquists contend the trial court erred because they alleged in their complaint that Bank of America was liable for the wrongdoing of Mission Hills " 'based on successor liability law,' " because the bank " 'assumed all liability of [Mission Hills] by the terms of which it succeeded to the Subject Loan,' " and because the bank " 'assumed all liabilities on the loan in its purchase of the loan from MISSION HILLS.' " In their view, these allegations were "neither conclusory nor do[ they] lack sufficient facts."

---

**2** Although the trial court purported to apply this aspect of its ruling to the first six causes of action in the complaint, as we have noted above the complaint expressly alleged only four causes of action against Bank of America based on the bank's status as the successor to Mission Hills: deceit, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligence.

8

The Sundquists' allegation that Bank of America was "liable for all acts of MISSION HILLS based on successor liability law" is not an allegation of fact; rather, it is a conclusion of law. As such, we disregard it for purposes of assessing the sufficiency of the Sundquists' complaint. (See *Aubry v. Tri-City Hospital Dist.*, *supra*, 2 Cal.4th at p. 967.) That leaves the allegations that the bank "assumed all liabilities on the loan in its purchase of the loan from MISSION HILLS" and that the bank "assumed all liability of the original lender by the terms of which it succeeded to the Subject Loan." Taken together, and giving them "a liberal construction with a view to substantial justice between the parties" (*Miglierini v. Havemann* (1966) 240 Cal.App.2d 570, 572), these allegations can be read to assert that pursuant to the specific terms under which Bank of America purchased the Sundquists' loan from Mission Hills, Bank of America agreed to assume *all* liability to which Mission Hills was subject in connection with that loan. Such a broad assumption of liability would include tort liability arising from the conduct of Mission Hills and/or its agents in the origination of the loan.

Defendants admit that "the tort liability of one corporation can be 'assumed voluntarily by contract' by another corporation." (See *Henkel Corp. v. Hartford Accident & Indemnity Co.* (2003) 29 Cal.4th 934, 941.) They contend, however, that "the Sundquists fail to identify a contract through which Bank of America assumed liability for Mission Hills' torts." But as we have explained, the allegations of Sundquists' complaint, liberally construed, can be read to assert that Bank of America assumed this liability under the terms of the agreement by which it purchased the loan from Mission Hills.

Bank of America points to the assignment of the deed of trust by which MERS assigned its interest in the deed of trust and the underlying note to BAC in June 2010 and contends that this assignment "does not . . . contain any language through which Bank of America could be found to have '*assumed liability*' for the torts of Mission Hills." The Sundquists did not allege, however, that this assignment document was the means by

9

which Mission Hills sold the Sundquists' loan to Bank of America, so the absence of assumption of liability language in this particular document does not preclude the possibility -- as suggested by the Sundquists' allegations -- that the actual purchase of the loan by Bank of America occurred through some other vehicle that *did* contain such language.

The conclusion that the assignment of deed of trust document was not the means by which Mission Hills transferred the Sundquists' loan to Bank of America is also supported by the fact that the deed of trust itself provided that MERS was "acting solely as nominee for Lender and Lender's successors and assigns" in serving as the beneficiary of the deed of trust. None of the documents appended to the complaint, nor any of the allegations of the complaint, suggest that the loan itself was ever transferred to MERS. Instead, from all that can be determined at this time, MERS was acting as beneficiary under the deed of trust solely as "nominee" for Mission Hills *and* for Mission Hills' "successors and assigns." Thus, it is entirely possible that Mission Hills sold the loan to Bank of America by means of some other agreement, and even after that transfer MERS continued to act as "nominee" -- now on behalf of Bank of America instead of Mission Hills -- until June 2010, when MERS assigned its interest in the deed of trust and the note to BAC.

In short, the allegations of the Sundquists' complaint, sparse though they are, suffice to allege that Bank of America assumed any liability Mission Hills had with respect to the origination of the Sundquists' loan. Accordingly, the demurrer to the first six causes of action was not properly sustained on this basis.

### III

### *Deceit*

The trial court concluded that the Sundquists had failed to state a cause of action for deceit because they did not "allege any misrepresentations . . . upon which [they] justifiably relied, and were damaged. . . . [¶] As plaintiffs signed the loan application,

10

statements therein are their representations, not defendants'. The loan application exists to protect the lender, not the borrower. [Citation.] Statements that plaintiffs would be able to later modify or refinance the loan are statements of opinion, and refer to a future fact. A misrepresentation must be as to a past or existing fact in order to be actionable."

On appeal, the Sundquists contend the trial court erred in finding that the representation that their income was correctly stated in the loan application was not actionable because "the broker has a duty not to make false material statements" and "[t]he existence of a confidential relationship may justify reliance upon oral misrepresentation of the terms of a contract."

The trial court's ruling on this point was based on the understanding that the Sundquists were complaining solely about the representation *in the loan application* that their income was greater than it actually was. If that understanding were correct, then the trial court's ruling would likewise be correct, because a statement in a loan application is not a statement *by* the lender *to* the borrowers, but instead is a statement *by* the borrowers *to* the lender, and obviously a person cannot complain that a statement he made to someone else was fraudulent. What the Sundquists' complaint alleged, however, was that either Harris or Kennaugh expressly misrepresented *to them* "that the loan application prepared by [Kennaugh] correctly stated [their] income." Liberally construed, the complaint further alleged that the Sundquists relied on this representation by signing the loan application without reading it (assuming it was in the packet of loan documents they signed). And the complaint alleged that if their income had not been inflated in the loan application, the loan might not have been approved and they would not have suffered the resulting negative consequences. We conclude these allegations are sufficient to state a cause of action for deceit.

The Sundquists also contend the trial court erred in finding that the representation about their ability to modify or refinance the loan was not actionable. On this point, we also agree.

11

"To be actionable, a . . . misrepresentation must ordinarily be as to past or existing material facts. '[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.' " (*Tarmann v. State Farm* (1991) 2 Cal.App.4th 153, 158.) "As a general rule the expression of an opinion cannot constitute fraud. However, this is not a hard and fast rule." (*Daniels v. Oldenburg* (1950) 100 Cal.App.2d 724, 727.) A person "may not justifiably rely upon mere statements of opinion, including legal conclusions drawn from a true state of facts [citations], unless the person expressing the opinion purports to have expert knowledge concerning the matter or occupies a position of confidence and trust." (*Seeger v. Odell* (1941) 18 Cal.2d 409, 414.)

Relying on this rule, the Sundquists argue that Harris, the person who told them they would be able to refinance or modify the loan immediately, "occupied a position of confidence and trust." Defendants offer no argument on this point. Liberally construing the complaint, we believe the Sundquists have adequately alleged a cause of action for deceit based on Harris's statement to them about the modifiability of the loan he had secured for them from Mission Hills. They had worked with Harris before in securing several other loans, and he was acting as their agent in securing this loan. When they expressed dissatisfaction with the proposed loan from Mission Hills, Harris told them they should just take the loan and get into the new house, and they could refinance or modify the loan immediately. Having worked with him before, the Sundquists trusted his statements and believed them to be true and relied on those statements in agreeing to the loan. As a result, they found themselves in a loan "they were unable to afford." The negative consequences that followed have been detailed above.

For the foregoing reasons, we conclude the trial court erred in sustaining the demurrer to the Sundquists' cause of action for deceit.

12

## IV

### *Conspiracy To Defraud*

The Sundquists' second cause of action alleged that defendants "conspired and agreed to implement a scheme to defraud and victimize [the Sundquists] through the predatory lending practices and other unlawful conduct alleged herein." Obviously this allegation encompassed the misrepresentations alleged as the basis for the Sundquists' cause of action for deceit.

The trial court concluded that the Sundquists had not stated a cause of action for civil conspiracy because they did not "adequately establish a wrongful act that would support a cause of action without the conspiracy." This conclusion was apparently based on the fact that the court had already found that the Sundquists had not stated a cause of action for deceit. We have concluded otherwise.

Nevertheless, "[i]n order to state a cause of action based upon a conspiracy theory the plaintiff must allege the formation and operation of the conspiracy, the wrongful act or acts done pursuant to it, and the damage resulting from such acts. [Citation.] In making such allegations bare legal conclusions, inferences, generalities, presumptions, and conclusions are insufficient." (*Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 521.)

Here, the Sundquists' allegations of a conspiracy to defraud them amount to no more than bare legal conclusions. As such, they are insufficient to withstand demurrer. Accordingly, the trial court did not err in sustaining the demurrer to the cause of action for civil conspiracy.

## V

### *Breach Of Fiduciary Duty*

The trial court concluded the Sundquists had failed to state a cause of action for breach of fiduciary duty because "there is no fiduciary relationship between a borrower and lender." On appeal, the Sundquists assert that "the breach of fiduciary duty was by

13

the broker to [them] and the liability of the lender [is] based upon their principal/agen[t] relationship." Defendants do not address this point.

In the trial court, defendants asserted that "[a]s a matter of law, an independent broker is the borrower's agent, and does not act for other parties such as lenders or loan servicers." The case law defendants cited, however, provides only that "[a] mortgage loan broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan." (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 782, italics omitted.) Defendants did not point to any law that necessarily *precludes* a broker as acting as a dual agent of both the borrower and the lender.

Here, the Sundquists alleged that there was an agency agreement between Ella and Mission Hills under which Mission Hills authorized Ella "to represent and bind MISSION HILLS in the . . . loan transaction." The complaint further alleged that an agency relationship exists because Mission Hills "directed and authorized the broker's conduct in connection with the . . . loan by directing the broker concerning what to tell [the Sundquists] and prospective borrowers to induce them to enter into the . . . loan with the bank." The complaint also contained numerous other allegations supporting the existence of an agency relationship between Ella and Mission Hills.

We are apprised of no authority that precluded Mission Hills from being held vicariously liable for a breach of fiduciary duty owed by its agent, Ella, to the Sundquists. And if Mission Hills could be held liable for that breach, then Bank of America could have assumed that liability from Mission Hills, as the Sundquists have alleged. For this reason, the trial court erred in sustaining the demurrer to the cause of action for breach of fiduciary duty.

VI

*Aiding And Abetting Breach Of Fiduciary Duty*

The trial court concluded the Sundquists had failed to state a cause of action for aiding and abetting a breach of fiduciary duty because they "fail[ed] to allege defendants

14

knew the broker's conduct constituted a breach of duty and gave substantial assistance, or that the bank's own conduct, separately considered, constituted a breach of duty."  On this point, the trial court was mistaken.

"California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort.  ' "Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." ' "  (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144.)

As the Sundquists point out, their complaint expressly alleged that "[d]efendants knew about one another's breaches of fiduciary duties owed to [the Sundquists]" and "[n]onetheless . . . actively, substantially and substantively assisted, aided, abetted, and advanced one another's fiduciary breaches by committing the conduct set forth herein above and below."  This allegation was adequate to satisfy the first part of the test set forth in *Casey*.

Defendants contend that the foregoing allegations "fail[ed] to specify any actions Bank of America took . . . in assistance of any breach of fiduciary duty by the Sundquists' broker during the origination of their loan.  Nor can they--the Sundquists admit that Bank of America had no involvement in the origination of their loan."  The flaw in this argument is that the Sundquists expressly premised Bank of America's liability for aiding and abetting a breach of fiduciary duty on the bank's status as the successor to Mission Hills, not on the bank's own actions.  As the original lender, Mission Hills was unequivocally involved in the origination of the Sundquists' loan.  If Mission Hills aided and abetted a breach of fiduciary duty in originating the loan, then Bank of America could have assumed that liability from Mission Hills, as the Sundquists

15

have alleged. For this reason, the trial court erred in sustaining the demurrer to the cause of action for aiding and abetting a breach of fiduciary duty.

VII

*Negligence*

The trial court concluded the Sundquists had failed to state a cause of action for negligence because "the allegations of the complaint show that this cause of action is time-barred, and [the Sundquists] fail to specifically allege facts justifying tolling. [Citation.] Further, [the Sundquists] do not allege that demurring defendants owed them a duty of care. A lender does not owe a duty of care to a borrower where the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."

On the statute of limitations issue, the Sundquists contend (essentially) that they did not discover, and could not have discovered, their cause of action for negligence any earlier than October 2009, when Bank of America sent them a letter telling them they did not qualify for a loan modification because their income was too high. Thus, according to them, their complaint filed in June 2011 was "well within the statutory period." We disagree.

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]

"A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. . . . Rather than examining whether the plaintiffs suspect facts supporting each specific legal

16

element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.)

Here, the Sundquists' negligence cause of action was premised on the allegation that Mission Hills made a loan to them that they could not afford knowing the loan was based on an inaccurate and overstated income figure. Although the Sundquists contend they "could not have discovered the fraud merely by reviewing the documents," they had to have known -- or, at the very least, they had reason to suspect -- no later than when they signed the loan documents that the monthly loan payment was nearly twice as much as what they had said they could afford. Also, had they read the loan application when they signed it -- which they do not allege they were prevented from doing -- they would have known that it overstated their income. On the facts alleged here, the limitations period on any negligence cause of action the Sundquists may have had against Mission Hills began to run no later than when the loan closed in September 2008. Because the Sundquists do not dispute that a negligence cause of action in this situation is subject to a two-year limitations period, the statute of limitations ran in September 2010, long before the Sundquists filed their complaint in June 2011. Accordingly, the trial court properly sustained the demurrer to the negligence cause of action.

VIII

*Promissory Estoppel*

The trial court concluded that the Sundquists had failed to state a cause of action for promissory estoppel because "there is no obligation on loan services to modify borrowers' loans. [Citations.] Defendants' purported promise to consider [the Sundquists for a loan modification] was at best a conditional promise which is not clear and unambiguous in its terms. [Citation.] Further, the allegations of the complaint show that [the Sundquists] were considered for modification."

17

On appeal, the Sundquists assert that "a bank or servicer may be held liable for inducing actions with a promise of a negotiated loan modification." In support of this assertion, they cite *Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218.

" 'The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." ' " (*Advanced Choices, Inc. v. State Dept. of Health Services* (2010) 182 Cal.App.4th 1661, 1672.)

In *Aceves*, the court concluded that the plaintiff had stated a cause of action for promissory estoppel under the following circumstances: "[P]laintiff, a married woman, obtained an adjustable rate loan from a bank to purchase real property secured by a deed of trust on her residence. About two years into the loan, she could not afford the monthly payments and filed for bankruptcy under chapter 7 of the Bankruptcy Code [citation]. She intended to convert the chapter 7 proceeding to a chapter 13 proceeding [citation] and to enlist the financial assistance of her husband to reinstate the loan, pay the arrearages, and resume the regular loan payments.

"Plaintiff contacted the bank, which promised to work with her on a loan reinstatement and modification if she would forgo further bankruptcy proceedings. In reliance on that promise, plaintiff did not convert her bankruptcy case to a chapter 13 proceeding or oppose the bank's motion to lift the bankruptcy stay. While the bank was promising to work with plaintiff, it was simultaneously complying with the notice requirements to conduct a sale under the power of sale in the deed of trust, commonly referred to as a nonjudicial foreclosure or foreclosure. [Citation.]

"The bankruptcy court lifted the stay. But the bank did not work with plaintiff in an attempt to reinstate and modify the loan. Rather, it completed the foreclosure." (*Aceves v. U.S. Bank N.A.*, *supra*, 192 Cal.App.4th at p. 221.)

18

Here, the Sundquists claim they, too, have stated (or can state) a valid cause of action for promissory estoppel because they "have alleged and can further allege that Defendants misled them with the false promise of negotiating in good faith a loan modification and failing to do so." In fact, that is *not* what the Sundquists have alleged. What they have alleged is that BAC "stated [it] would not consider a modification until [they] defaulted" on the loan. Such a statement is not a promise clear and unambiguous in its terms, like the bank's promise in *Aceves* to " 'work with [Aceves] on a mortgage reinstatement and loan modification' if she no longer pursued relief in the bankruptcy court." (*Aceves v. U.S. Bank N.A.*, *supra*, 192 Cal.App.4th at p. 226.)

The Sundquists assert, however, that they "can further allege" a "false promise of negotiating in good faith a loan modification." Thus, they claim they can amend their complaint to state a valid cause of action for promissory estoppel.

Defendants contend that even with this new allegation, "the promissory estoppel cause of action would still fail because the Sundquists cannot allege that Bank of America breached such a promise." According to defendants, the existing allegations of the complaint "refute any notion that Bank of America failed to act in good faith." We disagree.

The allegations to which defendants refer are the following:

"In April 2009, Plaintiffs hired ProCity to help them modify their loan. Throughout the summer, ProCity supposedly communicated with Bank of America and submitted all of Plaintiffs' financial information to obtain a modification.

"[¶] . . . [¶]

"Around late September and early October 2009, Bank of America sent a letter to Plaintiffs stating that they did not qualify for a modification, because Plaintiffs' income was too high.

"[¶] . . . [¶]

"Plaintiffs worked with Bank of America to try to clarify their financial status.

19

"[¶] . . . [¶]

"In Spring 2010, Plaintiffs worked with [a] HUD-approved agency, NID Housing Counseling, to get a modification. They took Plaintiffs' financial information and said that they looked good to get a modification. Plaintiffs spoke to Bank of America and provided financial information over the phone. However, they were told that since the arrears were too high and they were too far in default, Bank of America could not move forward with the modification."

Contrary to defendants' assertions, the foregoing allegations do *not* "refute any notion that Bank of America failed to act in good faith." In fact, these allegations say *nothing* about whether Bank of America or BAC fairly and reasonably considered the Sundquists for a loan modification. All that the complaint currently alleges is that the Sundquists asked the bank to modify their loan but the bank twice refused to do so. Whether the bank acted in good faith in considering the Sundquists' requests before denying them is simply beyond the existing allegations.

Based on the Sundquists' representation that they "can . . . allege that Defendants misled them with the false promise of negotiating in good faith a loan modification and failing to do so," we believe the Sundquists have shown that they can amend their complaint to state a valid cause of action for promissory estoppel. The gist of that cause of action would be this: The bank told the Sundquists that if they stopped making the payments on their existing loan, the bank would consider in good faith a modification of that loan. The Sundquists reasonably and foreseeably relied on that promise by stopping their loan payments in January 2009 and attempting to obtain a modification from the bank. The bank, however, never considered the Sundquists in good faith for a modification of their loan, and they were injured to their detriment because the bank ultimately told them they did not qualify for a modification because they were too far in arrears -- a situation that existed only because they stopped making their loan payments in reliance on the bank's promise to consider them for a loan modification in good faith.

20

Because it appears the Sundquists can amend their complaint to state a valid cause of action for promissory estoppel, the trial court abused its discretion in denying them leave to do so.

IX

*Wrongful Foreclosure*

The trial court concluded the Sundquists had failed to state a cause of action for wrongful foreclosure because they "failed to allege tender of the obligation in full. [Citation.] To the extent [the Sundquists] allege that their cause of action for wrongful foreclosure is based on an improper violation of the bankruptcy stay, such claim must be raised in bankruptcy court."

On appeal, the Sundquists assert that the "argument that this cause of action must be adjudicated by a bankruptcy court is a red herring." According to them, the exclusive jurisdiction of the bankruptcy court was limited to rescinding the trustee's sale that was conducted in violation of the bankruptcy stay. A claim for damages suffered as a result of the wrongful sale, they contend, is not within the bankruptcy court's exclusive jurisdiction because such a claim "requires the application of State law." More specifically, the Sundquists contend their "claims are for violation of Civil Code section 2924 for wrongful foreclosing on [their] home when they had no authority to do so."

Citing several cases, defendants assert that "[a] cause of action arising from a purported violation of an automatic bankruptcy stay under Title 11 must be raised in the bankruptcy court; state courts do not have jurisdiction over such claims." Although we do not find the cases defendants cite particularly persuasive on this point, we ultimately agree that exclusive jurisdiction over the Sundquists' wrongful foreclosure claim lay in federal court.

In the first case defendants cite, *In re Gruntz* (9th Cir. 2000) 202 F.3d 1074, a father who had failed to pay his child support obligation was convicted of a misdemeanor

21

in state court criminal proceedings in Los Angeles County. (*Id.* at p. 1077.) The father filed an adversary proceeding against the county in his ongoing bankruptcy "to declare the state criminal proceedings void as violative of the automatic stay imposed under 11 U.S.C. § 362." (*Gruntz*, at p. 1077.) "The bankruptcy court dismissed the complaint as collaterally estopped by the state judgment" and "[o]n appeal, the district court affirmed the dismissal . . . ." (*Id.* at pp. 1077-1078.)

On appeal, the Ninth Circuit defined one of the issues before it as "whether a state court modification of the bankruptcy automatic stay binds federal courts." (*In re Gruntz*, 202 F.3d at p. 1077.) The county argued that "the state court's judgment [in the criminal case] included a determination that the automatic stay did not enjoin the state criminal proceedings. Therefore, the County reason[ed], if a state court has concluded that the bankruptcy automatic stay does not apply, the resulting state judgment divests federal courts of jurisdiction to consider that question." (*Id.* at p. 1078.) In the course of rejecting this argument, the court noted that "[n]ot all matters related to bankruptcies fall within the orbit of those subject to federal plenary power." (*In re Gruntz*, 202 F.3d at p. 1080.) Nevertheless, the court held that "[b]ecause of the bankruptcy court's plenary power over core proceedings, the County's argument that states have concurrent jurisdiction over the automatic stay under 28 U.S.C. § 1334(b) is unavailing." (*Gruntz*, at pp. 1082-1083.) Accordingly, the court held "that federal courts are not bound by state court modifications of the automatic stay." (*Id.* at p. 1077.)

In our view, nothing in *Gruntz* supports the defendants' argument that the bankruptcy courts have exclusive jurisdiction over a cause of action arising from a violation of the automatic bankruptcy stay. In fact, *Gruntz* does not speak *at all*, directly or indirectly, to whether a cause of action for damages based on a defendant's violation of the automatic stay must be brought in the bankruptcy court or may be brought in state court instead.

*In re Davis* (Bankr. 9th Cir. 1995) 177 B. R. 907 is of little more assistance to defendants. In *Davis*, a chapter 13 debtor brought an adversary proceeding in the bankruptcy court alleging willful violation of the automatic stay based on postpetition foreclosures. (*Id.* at pp. 909-910.) After the bankruptcy was dismissed based on the debtor's failure to propose a feasible plan of reorganization, the defendants in the adversary proceeding moved to dismiss the proceeding for lack of subject-matter jurisdiction. (*Id.* at p. 910.) The bankruptcy court granted the motion (albeit on a different ground). (*Ibid.*)

On appeal, the court held that "[t]he bankruptcy court had subject-matter jurisdiction over all claims alleging willful violation of the automatic stay. Bankruptcy courts have jurisdiction over 'all civil proceedings arising under title 11, or arising in or related to cases under title 11.' [Citation.] Appellant's action for willful violation of the automatic stay is created by [former] section 362(h) of title 11 of the United States Code [now, 362(k)]. Thus, the action arises under title 11 and is within the subject-matter jurisdiction of the bankruptcy court."**3** (*In re Davis*, *supra*, 177 B. R. at p. 912.)

To say, as the appellate panel did in *Davis*, that the bankruptcy court has subject-matter jurisdiction over a particular type of claim is not to say that the court has such jurisdiction *to the exclusion of state courts*. Specifically, just because bankruptcy courts have jurisdiction over an action for willful violation of the automatic stay arising under the United States Code does not mean, necessarily, that state courts do not have concurrent jurisdiction over actions for wrongful foreclosure premised on violation of the stay. Accordingly, *Davis* does not directly support defendants' assertion here that a cause

---

**3**     "[A]n individual injured by any willful violation of a [bankruptcy] stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." (11 U.S.C. § 362(k)(1).)

of action for damages based on violation of the automatic stay must be brought in bankruptcy court.

Next, defendants rely on *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101.**4** In *Abdallah*, the plaintiffs sued the defendants in state court on various tort claims, including "claims that [certain real] property was improperly sold in violation of the automatic stay." (*Id.* at pp. 1105-1106.) On appeal from the dismissal of the action following the sustaining of the defendants' demurrers, the appellate court concluded "there was no violation of the automatic stay." (*Id.* at p. 1109.) The court then stated as follows: "Even if the foreclosure had violated the stay, appellants would have been required to raise that claim in the bankruptcy court. 'The bankruptcy court ha[s] jurisdiction over all claims alleging willful violation of the automatic stay.' [Citation.] The existence of a federal remedy for violation of the stay must be read as an implicit rejection of state court remedies." (*Ibid.*)

In support of the quoted language regarding the bankruptcy court's jurisdiction, the *Abdallah* court cited *In re Davis*. (*Abdallah v. United Savings Bank*, *supra*, 43 Cal.App.4th at p. 1109.) As we have seen, *Davis* does not speak to the *exclusive* jurisdiction of the federal courts. For its assertion that the existence of a federal remedy (in bankruptcy court) necessarily implies a rejection of a remedy in state court, the *Abdallah* court cited *Idell v. Goodman* (1990) 224 Cal.App.3d 262, 270-271. Accordingly, we turn to that case.

"In *Idell* . . . , the plaintiff's creditors brought an unsuccessful adversary proceeding in bankruptcy court under 11 United States Code section 727(a), alleging the plaintiff's debts should not be discharged. The plaintiff then sued defendants in state court for malicious prosecution of that adversary proceeding. [Citation.] In holding no

---

**4** They also cite *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, but *Hicks* relies entirely on *Abdallah*.

24

state court action could be maintained, the court in *Idell* stated: 'The existence of federal sanctions for the filing of frivolous and malicious bankruptcy pleadings must be read as an implicit rejection of state court remedies. The mere possibility of being sued in tort in state court, with the potential for substantial damage awards, could deter persons from exercising their rights in bankruptcy. Thus, it is for Congress and the federal courts, not state courts, to decide what incentives and penalties shall be utilized in the bankruptcy process.' " (*Satten v. Webb* (2002) 99 Cal.App.4th 365, 377-378, quoting *Idell v. Goodman*, *supra*, 224 Cal.App.3d at p. 271.)

The court in *Idell* drew its rationale for its ruling from *Gonzales v. Parks* (9th Cir. 1987) 830 F.2d 1033, "which upheld a bankruptcy judge's order vacating a state court judgment for abuse of process obtained by a bankruptcy creditor against a debtor." (*Idell v. Goodman*, *supra*, 224 Cal.App.3d at p. 269.) *Idell* quoted from *Gonzales* as follows: " 'Filings of bankruptcy petitions are a matter of exclusive federal jurisdiction. State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one . . . . That Congress' grant to the federal courts of exclusive jurisdiction over bankruptcy petitions precludes collateral attacks on such petitions in state courts is supported by the fact that remedies have been made available in the federal courts to creditors who believe that a filing is frivolous. Debtors filing bankruptcy petitions are subject to a requirement of good faith [citations], and violations of that requirement can result in the imposition of sanctions [citations]. Congress' authorization of certain sanctions for the filing of frivolous bankruptcy petitions should be read as an implicit rejection of other penalties including the kind of substantial damage awards that might be available in state court tort suits. Even the mere possibility of being sued in tort in state court could in some instances deter persons from exercising their rights in bankruptcy. In any event, it is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process

25

and when those incentives or penalties shall be utilized." (*Id.* at p. 269, quoting *Gonzales v. Parks*, *supra*, 830 F.2d at pp. 1035-1036.)

Reasoning by analogy from *Gonzales*, the *Idell* court concluded that "[s]ince the filing of a section 727 adversary proceeding to block the discharge of debts in bankruptcy is within the exclusive jurisdiction of the federal courts, and because sanctions are available to debtors when section 727 proceedings are filed in bad faith, . . . this malicious prosecution action was preempted by federal law." (*Idell v. Goodman*, *supra*, 224 Cal.App.3d at p. 271.)

The question here is whether the rational of *Idell* and *Gonzales* extends to a tort action for wrongful foreclosure based on foreclosure proceedings initiated in violation of the automatic stay. *Abdallah* concluded that because there is a federal remedy for violation of the stay, there can be no concurrent remedy of a tort action in state court. Although the *Abdallah* court was short on analysis, we believe it reached the correct result.

The best expression we have found of why the availability of a damages remedy in federal court precludes the prosecution of a tort cause of action in state court arising out of violation of the automatic stay can be found in *Smith v. Mitchell Const. Co., Inc.* (1997) 225 Ga. App. 383. In that case, a law firm for a construction company obtained a judgment against the plaintiff (Smith) and then served him with postjudgment discovery. (*Id.* at p. 384.) Smith did not respond, but filed a bankruptcy petition instead. (*Ibid.*) The firm successfully moved to have Smith held in contempt and jailed briefly for violating a court order compelling discovery. (*Ibid.*) Smith subsequently filed a state court action against the construction company and its law firm alleging false arrest, negligence, assault, and intentional infliction of emotional distress, claiming his arrest violated the automatic stay in his bankruptcy proceeding. (*Id.* at pp. 383-384.) The state court granted summary judgment, in part based on the finding that the action was preempted by federal law. (*Id.* at p. 383.)

On appeal, the appellate court noted the provision of federal law (now 11 U.S.C. § 362(k)(1)) that allows for damages for willful violation of the automatic stay and noted that whether that provision "preempts state law claims for conduct violating a stay in bankruptcy [wa]s a question of first impression in Georgia." (*Smith v. Mitchell Const. Co., Inc.*, *supra*, 225 Ga. App. at p. 384.) In concluding that a state court tort action *was* preempted, the Georgia appellate court wrote as follows:

"In deciding whether federal law preempts a state law, the court's primary consideration is whether Congress intended to exercise its authority under the Supremacy Clause. [Citation.] The mere existence of a detailed regulatory scheme does not alone imply intent to preempt. [Citation.] However, such intent may be inferred in an area in which federal legislation is especially pervasive or the federal interest is 'so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose.' [Citation.] Other 'special features' may also warrant preemption. [Citation.]

"Cases in several jurisdictions hold that the Bankruptcy Code preempts state law claims for abusive filings in bankruptcy court. [Citations.] Whether the Code preempts state law actions for conduct outside bankruptcy court that violates the automatic stay, however, has been considered in only two cases cited by the defendants: *Koffman v. Osteoimplant Technology*, 182 B. R. 115 (D.Md. 1995), and *In re Shape, Inc.*, 135 B. R. 707 (D.Me. 1992).

"After Shape, Inc. filed a chapter 11 reorganization petition, a creditor with whom it continued to do business raised the prices of goods it sold Shape. Shape brought suit against the creditor in another court, claiming the price increase was a thinly disguised attempt to recover the price of goods Shape had received, but not paid for, before it filed its bankruptcy petition. Shape argued this was both a violation of the automatic stay, compensable under § 362[(k)(1)], and an unfair business practice under state law.

27

[Citation.] In holding that the Bankruptcy Code preempted the state law claim, the *Shape* court noted that the debtor did not allege the price increase to be illegal in itself. Rather, it was an allegedly unfair business practice only because it violated the bankruptcy stay. [Citation.] 'Since this federal statute is applicable here, and has its own enforcement scheme and separate adjudicative framework, it must supersede any state law remedies.' [Citation.]

"Similarly, Smith does not contend that defendants' efforts to collect on a judgment were illegal in themselves. Their illegality arose solely from the fact that Smith had a bankruptcy case pending, which gave rise to the automatic stay. *Shape* is persuasive authority for holding that such bankruptcy-dependent claims should be preempted as coming within the Bankruptcy Code, which 'provides a comprehensive scheme reflecting a balance, completeness and structural integrity that suggests remedial exclusivity.' [Citation.]

"*Koffman v. Osteoimplant Technology*, *supra*, employed similar reasoning to reach a similar conclusion. After Osteoimplant Technology, Inc. ('OTI') had been placed in an involuntary chapter 7 bankruptcy, Koffman filed a collection suit against it, violating the stay. Koffman then dismissed the suit and moved the bankruptcy court to enjoin OTI's president from leaving the country, allegedly making bad faith representations about the president's intended conduct. After the chapter 7 petition had been dismissed, OTI sued Koffman, alleging abuse of process and malicious prosecution. (A third cause of action was dismissed for lack of evidence.) [Citation.]

"The *Koffman* court reasoned that 'the automatic stay is imposed exclusively as a matter of federal bankruptcy law, and the Bankruptcy Code provides a remedy for willful violations of that stay, 11 U.S.C. § 362[(k)(1)]. State created rights have nothing to do with the application of the automatic stay. Allowing state tort actions based on allegedly bad faith bankruptcy filings or violations of the automatic stay to go forward ultimately would have the effect of permitting state law standards to modify the incentive structure

28

of the Bankruptcy Code and its remedial scheme.  Because such a result threatens to erode the exclusive federal authority in this area, and because it would threaten the uniformity of federal bankruptcy law, the Court finds that OTI's state tort suits are preempted by the federal Bankruptcy Code.'  [Citation.]

"We find the reasoning of *Shape* and *Koffman* persuasive.  As noted in *MSR Exploration,* [*Ltd. v. Meridian Oil* (9th Cir. 1996) 74 F.3d 910, 912-915 ], 'Congress has expressed its intent that bankruptcy matters be handled in a federal forum.'  The need for uniformity in bankruptcy matters was recognized even by the framers of the Constitution, who granted Congress the power to 'establish . . . uniform Laws on the subject of Bankruptcies throughout the United States' in Art. I, § 8, cl. 4.  [Citation.]  From this long-recognized need for uniformity; from the comprehensive structure of the current Bankruptcy Code; and from Congress' inclusion in that structure of § 362[(k)(1)], which provides a remedy for stay violations, we infer Congress' intent to effectuate two related principles:  Creditors should be held to a uniform standard of conduct when dealing with bankruptcy debtors, and the bankruptcy courts are the only institutions capable of fashioning such a uniform standard.  These principles dictate our holding:  § 362[(k)(1)] preempts Smith's state law claims against Mitchell Construction and its lawyers for the actions they took in violation of Smith's bankruptcy stay. The trial court was correct in granting summary judgment to the defendants on that basis."   (*Smith v. Mitchell Const. Co., Inc.*, *supra*, 225 Ga. App. at pp. 384-386.)

We have nothing to add to the Georgia court's analysis.  The Sundquists' cause of action for wrongful foreclosure is based entirely on the sale of their property in violation of the automatic stay.  Any remedy the Sundquists have for damages incurred because of that wrongful foreclosure must be sought in federal court.  The trial court here correctly sustained the demurrer to this cause of action on the ground that it lacked jurisdiction over the claim.

# X

## *Unfair Competition*

The trial court concluded that the Sundquists had failed to state a cause of action for unfair competition because they did not "establish a specific law or laws that were violated, that defendants committed fraud, or that defendants were required to modify [their] loan. A defense to the predicate claim is a defense to the Unlawful Competitions [*sic*] Law claim."

On appeal, the Sundquists argue that because they alleged "causes of action for Defendants' deceit, negligence, and breaches of fiduciary duty, and wrongful foreclosure, [they] have stated a claim for violations of the unfair competition law."

For the same reason (explained above) that the Sundquists' wrongful foreclosure cause of action was preempted by federal law, their unfair competition cause of action was also preempted -- at least to the extent the latter was premised on the former. As for the remaining causes of action, we have concluded that the Sundquists have stated causes of action for deceit and breach of fiduciary duty (although their negligence claim is time-barred). Based on that conclusion, we likewise conclude the Sundquists have stated a cause of action for unfair competition.

Business and Professions Code section 17200 proscribes " ' "anything that can properly be called a business practice and that at the same time is forbidden by law.' " (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 . . . .) '[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.' " ' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383.)

Here, liberally construed, the Sundquists' complaint can be understood to allege that defendants made it a business practice to get people like the Sundquists into loans

30

they did not actually qualify for and could not afford by making fraudulent representations in the origination of the loans -- for example, by completing the loan applications for the borrowers with inflated income figures but telling the borrowers the figures used were accurate. As for defendants' argument in the trial court that the Sundquists lack standing to pursue their unfair competition cause of action because they "fail[ed] to allege suffering any losses beyond the amounts owed under the Note," we believe the Sundquists have adequately alleged damages stemming from the deceit and breaches of fiduciary duty they claim were business practices of defendants, which caused them to agree to a loan they could not afford, with all the negative financial consequences that followed. Accordingly, we conclude the trial court erred in sustaining the demurrer as to the unfair competition cause of action.

## DISPOSITION

The judgment of dismissal is reversed, and the case is remanded to the trial court with instructions to vacate its order sustaining the demurrer in its entirety without leave to amend and to enter a new order: (1) sustaining the demurrer to the causes of action for civil conspiracy, negligence, and wrongful foreclosure without leave to amend; (2) sustaining the demurrer to the cause of action for promissory estoppel with leave to amend; and (3) overruling the demurrer to the causes of action for deceit, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unfair competition. The Sundquists shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


          ROBIE  , Acting P. J.

We concur:


  MURRAY  , J.


  DUARTE  , J.

31